### BEULAH FORESTER v. THE STATE.

No. 2812. Decided December 23, 1913.

**1.—Drinking and Permitting to be Drunk Spirituous, Vinous and Malt Liquors in a Disorderly House—Sufficiency of the Evidence.**

Where, upon trial of a violation of the Act of April 23, 1911, Thirty-second Legislature, the defendant was indicted for keeping a disorderly house and selling, giving away and permitting to be drunk and drinking spirituous, vinous and malt liquors in said house, etc., the evidence sustained the conviction, there was no error.

**2.—Same—Charge of Court—Knowledge of Defendant.**

Where, upon trial of permitting to be drunk and drinking spirituous, vinous and malt liquors in a disorderly house kept for purposes of prostitution, the evidence showed that the defendant knew that such liquors were given away and drank in said disorderly house, a complaint to the court's charge that it authorized defendant's conviction without such knowledge was untenable; besides, the court's charge was applicable to the facts and there was no error in refusing special instructions requested by the defendant.

**3.—Same—Information—Complaint.**

Where, upon trial of keeping a disorderly house and selling, permitting to be drunk and drinking spirituous, vinous and malt liquors in said house under the Act of the Thirty-second Legislature, the complaint and information substantially followed said Act, the same were sufficient.

**4.—Same—Requested Charges—Bill of Exceptions.**

In the absence of a bill of exceptions to the refusal of the court of requested charges in a misdemeanor case, the matter can not be considered on appeal.

Appeal from the County Court of Tarrant. Tried below before the Hon. Jesse M. Brown.

Appeal from a conviction of keeping a disorderly house and permitting to be drunk and drinking therein spirituous, vinous, and malt liquors; penalty, a fine of $200 and twenty days confinement in the county jail.

The opinion states the case.

*Mays & Mays,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was tried on August 1, 1913, and convicted under the Act of April 23, 1911, page 23, of the Acts of the Thirty-second Legislature. This Act is:

"Section 1. That if any person, whether the owner, lessee, manager, housekeeper, proprietor, servant, agent, employe, inmate, visitor or any other person shall sell, give away or drink, or permit to be sold, given away or drunk, any spirituous or vinous or malt liquors, whether capable of producing intoxication or not, in any bawdy house, disorderly house or assignation house, shall be guilty of a misdemeanor, and upon conviction such person or persons shall be punished by imprisonment in the county jail for a period of not less than thirty days nor more than ninety days, and by a fine of not less than fifty nor more than five hundred dollars.

"Section 2. For the purpose of this Act a bawdy house is one kept for prostitution, or where prostitutes are permitted to resort for the purpose of plying their vocation.

"A disorderly house is an assignation house or any theater or any play house or house or place where prostitutes or lewd women or women of bad reputation for chastity are employed, kept in service, or permitted to resort or permitted to display or conduct themselves in a lewd or lascivious or indecent manner.

"An ·assignation house is a house or room or place where men and women meet by appointment made by themselves or by another for the purpose of sexual intercourse."

We will give the testimony substantially, on the material questions in the case. Walter Wallace, one of the city detectives of Fort Worth, testified that he knew appellant and the Rosen Hotel in Fort Worth, and gave the location of it; that he knew the general reputation of said hotel and that its reputation was that of a whore house; that about the time he arrested appellant on this charge she told him and also Mr. Ladd that she was running the house; that he had seen many prostitutes around there and saw them drink whisky and beer therein; that he had seen as many as five women at a time therein, whose reputations were bad, and that he had seen appellant present and sitting around in the parlor with them and they all drinking beer, and she drinking whisky; that he had also seen two or three men there at such times; that it was a house of bad reputation. "Everyone says and knows it is a whore house, and I know it is a whore house;" that he had arrested two or three women there as common prostitutes and they paid fines as such; that he had seen several women there at a time, of bad reputation, and in the parlor, and saw the appellant present at such times with them and saw all of them, including her, dancing and drinking beer and whisky; that he knew a woman by the name of Green and another by the name of Sprinkle, and arrested both of them there as common prostitutes; that appellant had been there two or three years; her reputation is that of a common prostitute and she had paid fines as such six or seven times.

On cross-examination: That he had been at that house many times, possibly fifty, more or less; that he had only made three arrests therein of women as common prostitutes—one was said Mrs. Green, and another Sprinkle, and appellant, and that he had arrested appellant at the same time on this charge; that he had known that place to be a whore house for two or three or six years.

Mr. Ladd, another city detective of Fort Worth, testified that he knew appellant and she had been at said Rosen Hotel for two or three years; that at one time when he was there he saw her sitting on the edge of a bed with a man; that he had seen women drink beer and dance there; that he knew the general reputation of said hotel and that it was bad— as being a whore house. On cross-examination: That he had been at said house as many as four times; the first time he saw the said women Green and Sprinkle there; he couldn't tell who all he saw and each time, nor when it was. "But it is a house of bad reputation, and everybody knows it is a whore house. I saw some women there with kimonos on; regular whore house dresses."

Ollie Stanley, one of the Fort Worth city policemen, testified that he knew said Rosen Hotel, and had known it for several years and knew its general reputation as that of a whore house; he had been there a number of times and had seen them drop a quarter in a slot to make a piano play, and they would dance by it; that the piano was one of those

electric pianos in a room fitted up as a dance hall; that he had seen appellant there with several other women and men and had seen them drink whisky and beer and dance; that he pulled a woman out of bed there one night as a common prostitute and rode her to the city hall; she was in bed with a man at the time; that it was a place where women of bad reputation resort; that he had been there frequently for the past six months or year, and had seen appellant present when they were dancing and drinking beer, and had seen her drinking whisky at such times. On cross-examination: That when he pulled that woman out of bed, appellant was in her own, and in bed with another woman; that appellant begged him not to ride the woman he had arrested to the city hall; that he had never seen appellant in bed with a man, except once lying on a bed talking with a man that was lying behind her; that she had on one of those loose kimonos; the man was dressed, and he was not her husband.

H. G. Musick, another Fort Worth city policeman, testified that he knew the Rosen Hotel and its general reputation; that its reputation was bad; that he had been there a few times—he couldn't tell how many; that he arrested a man and woman there not long ago on a charge of prostitution; that they were in bed together; that he carried them to the city hall; they had a marriage license, and the court turned them loose; that he never saw appellant have any improper relations with any man.

When the State had introduced the above testimony it rested. The appellant then introduced her testimony. She, herself, testified that she had lived or roomed at said hotel something like two years; that she swept the floors there and looked after the linen; that she was merely house-keeper of said hotel; that Robinson owned it; that she had nothing to do with it, except as the house-keeper; had nothing to do with running or receiving the guests and showing them their rooms and got none of the proceeds. She denied telling Mr. Wallace that she ran the hotel; that sometimes "we send down and order beer and whisky from the saloon below when we want it and drink it up there." That she knew the women, Green and Sprinkle, and still another woman whose name she couldn't remember, who lived there a year; that all of them were arrested there on charges of being common prostitutes; that personally she didn't know whether they were that kind of women or not; that she never saw them do anything wrong. On cross-examination: That all three of said women, Green, Sprinkle and the other woman, who resided in said hotel and all of whom were arrested charged with being common prostitutes, she heard, had paid fines for it. She admitted that she paid three fines herself on being arrested charged with being a common prostitute; that she plead guilty—preferred to do so rather than be published; she denied that she had paid as many as six or seven fines for the same offense. She testified: "Yes, I have heard it said that the Rosen Hotel had the reputation of being a whore house. I have heard people say that it had that kind of a reputation. * * * I

have drunk whisky up there in the presence of others, and others have drunk beer there in my presence;" that she never paid for the whisky or beer; that when they wanted anything to drink they would send down to the saloon below for it and the porter would bring it up and he would be paid for it; that she never received the money herself; that parties who would be up there would buy the beer or whisky and treat the others there in the parlor; that when they wanted it they would send down to the saloon below and get it and drink it up there; it was drunk in her presence frequently, and she had drunk it.

Mr. Dunlap testified for her, that he knew the location of said hotel; that he didn't know whether it was a whore house or not; that he had heard it said that it was; that he knew appellant; that he did the laundry work for the hotel and had done so for about two years; was there about twice a day; that he had never seen anything wrong up there, but had heard it said it was a whore house; that Robinson always paid him the bills for the laundry, appellant had nothing to do with it. On cross-examination: That he merely went there to collect the laundry and paid no attention to the place and never noticed anything wrong with it; that he had heard it had the reputation generally of being a whore house; that there could have been prostitutes living there and he not have seen them.

Mr. Curby for her, testified, that he worked in a drug store close to the Rosen Hotel; that he had been to the hotel a number of times to collect glasses from the soda fountain that had been carried there and left; that he had never noticed anything wrong with the place; that he paid no attention to what was going on; that they frequently sent cold drinks up there and he would go up to collect up the glasses. On cross-examination: That he wasn't looking for anything wrong up there and paid no attention to what was going on; that most anything could be going on there and he would not know anything about it, for he wasn't looking for anything and paid no attention to it. "Yes, I know the general reputation of the house with reference to its being a disorderly house or otherwise; it has the reputation of being a disorderly house. I know nothing about it, personally."

Mr. Barble, testified for her, that he was the clerk in the Rosen Hotel and had been for several months; that he received the guests, collected from them, and assigned them their rooms; that Robinson paid him and was the one that hired him and to whom he looked for instructions. He knew appellant, she had nothing to do with the hotel and running of it. "She is merely the house-keeper;" that he did not know her at all in transacting the business of the hotel; that he looked to Robinson alone; that he made his contract with Robinson and he received the guests and placed them in their rooms in the hotel; that they were mostly transient people who came there over night and left. On cross-examination: That he was looking after the hotel for Robinson; that he had been in the hotel a number of times. "I have heard it said that the hotel bore the general reputation of being a disorderly house, and

a house to which women of bad reputation resorted, but I know nothing about that part of it myself."

Anderson testified for her, that he was a blacksmith and roomed at said hotel and had been for several months; that he knew appellant; that he had never seen anything wrong with her actions.

Thereupon, she rested and the State, in rebuttal, introduced Tom Blanton, who testified that he was one of the county detectives, and had been for years on the police force of said city; that he knew the Rosen Hotel and its general reputation; that it bore the reputation of being a disorderly house; that he knew appellant, went to her room door shortly before then, knocked and she got up and opened the door for him, and Robinson was in her bed there in her room; that he had seen women drink beer in that place when appellant was present and saw her drink whisky in there; that Robinson was not at the time he saw him in appellant's bed, her husband, nor have they since married.

Tom Wren testified for the State, that he was a city detective and knew said hotel and was acquainted with its general reputation and it was that of being a whore house; that he had seen women drink beer there and had seen them do so when appellant was present; that he never saw her receive money for it, but had seen her drink whisky there; that her general reputation is that of a common prostitute. This is in substance the whole of the testimony. Appellant has only one bill of exceptions and that is an omnibus bill. It quotes that portion of the court's charge submitting the case to the jury for a finding; then quoting the three counts of the indictment under which the conviction was had, and the verdict of the jury. He then complains of the court's charge because, he claims, it authorized appellant's conviction whether she *knew* said intoxicants were given away or not, and whether she *knew* that same was drunk on said premises. Certainly this is no proper complaint of this charge, because, not only does all of the testimony show that she knew this, but she herself positively testified to her knowledge of these facts and that she herself repeatedly drank whisky on said premises. His other complaint to this charge is that it authorized her conviction whether she *knew* said house was a disorderly house or not, and whether or not she knew prostitutes resorted there and plied their vocation. The same may be said of this as of the above; but the court's charge did not authorize her conviction whether she knew prostitutes resorted there and plied their vocation there, or not. The bill then quotes a special charge she requested which was refused. This special charge was not applicable to the evidence or the law of this case and, of course, was properly refused. The court's charge correctly submitted the question to the jury for a finding under the law, as applicable to the facts of this case, and that was all that was necessary for the court to submit. The bill points out no reversible error.

No motion was made to quash the complaint or information. One ground of the motion for new trial is, that the court erred in not quashing the information or complaint, and especially the third count, as it

charged no offense against the laws of the State. The complaint and information were based on and followed substantially and fully the Act of the Legislature, first hereinabove quoted, and was clearly sufficient.

The only other ground in his motion for new trial is that the court erred in refusing to give his special charges numbered from one to fourteen, inclusive. Appellant is not shown to have taken a bill of exceptions to the giving of any of these, and, hence, in a misdemeanor case they can not be considered.

Under the law and evidence in this case no other verdict and judgment could legally have been rendered, except that convicting the appellant. No reversible error is shown, and the judgment is affirmed.

*Affirmed.*

DAVIDSON, JUDGE, absent.